Filed 8/7/13  Buckley v. De Jong CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JAMES BUCKLEY, | D059316 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2009-00092288-CU-BC-NC) |
| ARIE DE JONG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David G. Brown, Judge.  Reversed.

Niddrie, Fish & Addams, David A. Niddrie; White and Bright, Leigh A. Rayner and Randolph W. Ortlieb for Defendant and Appellant.

Law Offices of Neal A. Markowitz, Neal A. Markowitz; Lepine Law Group, Amy J. Lepine, Charles L. Pratt and Sara A. Simmons for Plaintiff and Respondent.

In this breach of contract case, we reverse the $2.8 million verdict entered in favor of the plaintiff.  The record demonstrates that jurors, who believed the plaintiff was not

entitled to any damages, compromised their view of the evidence in order to reach a verdict rather than because they agreed the plaintiff established the right to a substantial recovery. Our conclusion is based on the responses the trial court gave the jury to questions they had during the course of deliberation, affidavits of jurors with respect to what took place during deliberation, and the fact that the amount awarded was substantially less than the principal damages theory advanced by the plaintiff at trial.

We note the plaintiff's theories of both liability and damages were based in substantial part on his contention that the defendant failed to properly compensate him for sums he claimed were due on an earlier agreement, which itself was contingent on the outcome of contracting decisions made by the governing boards of local municipalities. Arguably, these theories of liability and damages are barred by public policy. Because this defense was not raised below and because there may be circumstances which relieve plaintiff from it in whole or in part, we decline to resolve this issue at this juncture. Rather, on remand, the defendant may raise public policy as a defense to the plaintiff's claims, and the plaintiff may fully contest the validity and application of the defense.

## FACTUAL BACKGROUND

A. *The Parties*

Plaintiff and respondent James Buckley has spent a good deal of his working career as a salesman, first in the restaurant equipment business and then later selling and servicing commercial waste disposal contracts. In 1988, Buckley became interested in exploiting the possibility of turning waste into compost and, in particular, a company

2

called Agripost, which was promoting the concept. As a result of his experience both selling and managing waste disposal contracts and his interest in waste-to-compost opportunities, Buckley became very familiar with the waste disposal industry and collected a substantial amount of information about trash collection companies in Southern California and their franchise agreements with local municipalities.

Defendant and appellant Arie DeJong has owned and managed a number businesses in northern San Diego County. In 1976, he purchased a small waste management company and, over time, operating it as Coast Waste, DeJong built it into a sizeable enterprise with a fleet of trucks and the only waste transfer station in the north county area. Between 1976 and 1994, DeJong unsuccessfully attempted to get trash hauling contracts in Escondido, Poway, Encinitas, and a landfill contract with the cities of Oceanside, Carlsbad and Escondido.

B. *1994-1997 Agreements*

In 1994, Buckley contacted DeJong and tried to interest DeJong in participating in an Agripost trash-to-compost venture. Because Agripost had not been successful, DeJong declined to invest in the venture.

However, DeJong was very impressed by all the information Buckley had collected with respect to the trash collection business in Southern California and, in September 1994, DeJong enlisted Buckley's assistance in obtaining documents relevant to the circumstances under which the trash franchise in the City of Poway (Poway) had been awarded to one of Coast Waste's competitor's, Mashburn Sanitation (Mashburn), in 1991.

3

Without any agreement as to his compensation and after a great deal of effort on Buckley's part, Buckley obtained copies of the bids and rate sheets submitted by the bidders on the 1991 Poway trash franchise. DeJong was pleased with Buckley's success and asked him to obtain any documentation which would show that Mashburn had acted unlawfully in obtaining the Poway trash franchise. This task became quite time consuming and, according to Buckley, led the parties to enter into a partnership agreement in January 1995. Buckley testified at trial that he and DeJong agreed Buckley was "to bust -- or to expose that there was some corruption or whatever in Poway on that bid . . . and if [DeJong] got [the Poway franchise], we'd be partners. That was the sum total."

At the time DeJong made this agreement with Buckley, DeJong was also engaged in efforts to obtain contracts that had been awarded to Mashburn by the cities of Encinitas and Escondido. DeJong sued Mashburn with respect to Mashburn's successful Encinitas bid; in Escondido, DeJong sponsored a ballot initiative which would require competitive bidding on the city's refuse collection franchises. Shortly after Buckley and DeJong reached their partnership agreement with respect to Buckley's work on the Poway trash contract, they agreed to expand the agreement to include work DeJong wanted Buckley to do on the lawsuit against Mashburn and the Escondido initiative. Thus, according to Buckley, he would become DeJong's partner on any trash contract DeJong obtained from Poway, Encinitas or Escondido.

With respect to Poway, Buckley obtained information that showed Mashburn had

4

made unlawful campaign contributions to members of the Poway City Council. This information led to a Fair Political Practices Commission complaint and fine. Buckley also initiated litigation against the City of Encinitas and obtained information from the city about Mashburn's successful bid for the contract there. Finally, Buckley assisted the campaign consultant DeJong retained to support the Escondido initiative. DeJong paid Buckley on an hourly basis for the work he did and reimbursed him for his expenses.

None of DeJong and Buckley's efforts to obtain trash contracts in Poway, Encinitas or Escondido were successful: DeJong's lawsuit against Mashburn was dismissed on Mashburn's demurrer, Poway did not reopen its trash contract and the Escondido trash initiative was rejected by voters.

In 1997, DeJong sold Coast Waste to U.S.A. Waste Management (U.S.A. Waste). The sale included a covenant which prevented DeJong from competing in the north county area for a period of five years. Buckley testified that at some point after the sale, DeJong told him that DeJong was able to obtain a premium of $10 million on the sale because of the work Buckley had performed. According to Buckley, DeJong received the premium because Buckley's work in exposing Mashburn's improprieties increased the amount Mashburn was willing to pay for Coast Waste and, hence, the amount DeJong was able to extract from the successful purchaser, U.S.A. Waste. Buckley believed that under the terms of their partnership agreement, DeJong should have paid him one-half of the $10 million premium.

5

C. *2005 Agreement*

After he sold Coast Waste, DeJong maintained contact with Buckley and, in 2005, again asked Buckley for help. At that time, DeJong was sponsoring a study being conducted by students at California State University at San Marcos (CSSM). The aim of the study was to compare the cost of trash collection in municipalities who awarded trash contracts in an open competitive bidding process with the cost in municipalities, such as the City of San Marcos (San Marcos), which used a closed process to award trash contracts. DeJong hoped to use the study to convince the San Marcos City Council to adopt an open bidding process on its trash contracts.

DeJong asked Buckley to help the CSSM students with the trash study. Buckley was very reluctant to help DeJong because he believed DeJong still owed him half of the $10 million premium DeJong had received on the Coast Waste sale. According to Buckley, he was also concerned that the effort to convince San Marcos to open its bidding process would not be successful unless DeJong took a very aggressive approach and was among, other things, willing to engage in litigation with San Marcos. For his part, DeJong preferred to take a more "diplomatic" approach and use the CSSM study to lobby the San Marcos City Council.

Buckley testified that in light of his concerns about what he believed he was owed for his previous work and the likelihood DeJong's preferred diplomatic approach would not be successful, he demanded that, in exchange for Buckley's help, DeJong pay Buckley $5 million when it became apparent the diplomatic approach had been

6

unsuccessful. According to Buckley, DeJong verbally agreed to his terms; Buckley testified that the agreement was not put in writing because both DeJong and Buckley had been subject to harassment and intimidation when contesting the Poway, Encinitas and Escondido trash contracts.

For his part, DeJong denied making such an agreement with Buckley and testified that he only expected to pay Buckley on an hourly basis when the project was complete.

Buckley worked on the CSSM study and provided approximately 45 hours of assistance. As Buckley predicted, when the study was complete and presented to the San Marcos City Council, the city council declined to alter its trash bidding process. When DeJong told Buckley that the effort had been unsuccessful and asked Buckley to send him an invoice, Buckley's lawyer responded on his behalf with a demand for the $5 million Buckley believed was due. DeJong did not honor the demand.

PROCEDURAL HISTORY

A. *Breach of Contract Causes of Action*

Buckley filed a complaint against DeJong in which he alleged claims for breach of contract, breach of the covenant of good faith and fair dealing, and quantum meruit. By way of an amended complaint, Buckley alleged that DeJong's obligation to pay him $5 million arose when San Marcos refused to adopt a competitive bidding process for trash contracts.

At trial, Buckley dismissed all his causes of action except for two breach of contract causes of action.

7

B.  *Verdict*

According to juror affidavits filed in support of DeJong's later motion for a new trial, the jury had considerable difficulty reaching a verdict.  While the majority of jurors wanted to award Buckley $5 million, a minority did not want to award him any damages.  One juror suggested that they compromise, and this suggestion led to a series of questions posed by the jury to the trial court.  The jury first asked the trial court whether it was bound by Buckley's demand for $5 million; the trial court responded by telling the jury to reread its instruction as to the elements of a cause of action for breach of contract.

The foreman then conducted a series of votes on diminishing amounts of damages in an effort to find a figure which would garner nine votes.  The foreman reached $2.5 million and instead of gaining votes began losing them.  The jury then sent the trial court a second question which expressly asked the trial court whether the $5 million in damages Buckley requested was "negotiable" or "does it have to be $5 million or nothing?"  The trial court responded by telling the jury that it did not have to find $5 million in damages or nothing but that any amount had to be agreed to by nine of the jurors.

The jury then deliberated for an additional three hours and sent the trial court a note stating that "[W]e are at an impasse.  7 to 5.  Require further instruction from the court."  The trial court referred the jury to its previous answer and stated:  "Please continue to deliberate."  After reading the trial court's answer, the jury foreman then began a series of votes starting at $2.5 million and increasing the amount of damages

8

with each unsuccessful vote. When the amount reached $2.8 million, nine jurors voted in the affirmative, and the jury promptly returned a verdict in that amount without any further deliberation.

C. *Postrial Proceedings*

Following the verdict, DeJong moved for a new trial on, among other grounds, his contention that the jury had returned an improper compromise verdict. DeJong pointed out that at trial, Buckley had repeatedly argued that under the terms of his agreement with DeJong, he was owed $5 million.

Relying on testimony the founder of Agripost had given to the effect that it had cost him between $2 and $3 million to open a trash-to-compost facility, Buckley argued that the jury could have relied on that testimony to determine that he had suffered $2.8 million in damages. The trial court agreed with Buckley and denied the motion for new trial.

DeJong filed a timely notice of appeal.

DISCUSSION

I

In his principal arguments on appeal, DeJong argues that the jury's verdict was an improper compromise or, in the alternative, a chance verdict. We agree that the jury improperly compromised in reaching its verdict and accordingly reverse the judgment.

A. *Standard of Review*

Contrary to Buckley's contention, when as here, a motion for new trial is made on

9

the grounds a verdict was the product of jury misconduct, we review the trial court's ruling de novo. "'In reviewing the denial of a motion for new trial based on jury misconduct, the appellate court "has a constitutional obligation [citation] to review the entire record, including the evidence, and to *determine independently* whether the act of misconduct, if it occurred, prevented the complaining party from having a fair trial." [Citations.]' [Citation.]" (*Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1745, italics added; see also *People v. Cumpian* (1991) 1 Cal.App.4th 307, 311.)

B. *Juror Affidavits*

In the trial court, Buckley objected to the juror affidavits DeJong submitted on the grounds they improperly purported to reflect the mental processes of the jurors. (See Evid. Code, § 1150; *In re Stankewitz* (1985) 40 Cal.3d 391, 398.) Arguably, because Buckley never obtained a ruling on his objections, the objections are deemed overruled and waived on appeal. (See *Demps v. San Francisco Housing Authority* (2007) 149 Cal.App.4th 564, 576.) However, in the context of motions for summary judgment, the harsh waiver rule has been severely criticized and recently abandoned. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532.) Accordingly, we decline to follow it here and instead reach the merits of Buckley objections.

"The Legislature has declared that evidence of certain facts is admissible to impeach a verdict: 'Upon an inquiry as to the validity of a verdict, *any otherwise admissible evidence may be received as to statements made*, or conduct, conditions, or

10

events occurring, either within or without the jury room, *of such a character as is likely to have influenced the verdict improperly*.'  (Evid. Code, § 1150, subd. (a), italics added.)  It is settled that jurors are competent to prove 'objective facts' under this provision.  [Citation.]  By contrast, the Legislature has declared evidence of certain other facts to be inadmissible for this purpose:  'No evidence is admissible to show the *effect* of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.'  (Evid. Code, § 1150, subd. (a), italics added.)  Thus, jurors may testify to 'overt acts' -- that is, such statements, conduct, conditions, or events as are 'open to sight, hearing, and the other senses and thus subject to corroboration' -- but may not testify to 'the subjective reasoning processes of the individual juror . . . .'  [Citation.]

"Among the overt acts that are admissible and to which jurors are competent to testify are statements.  [Evidence Code] [s]ection 1150, subdivision (a), expressly allows proof of 'statements made . . . either within or without the jury room . . . .'"  (*In re Stankewitz*, *supra*, 40 Cal.3d at pp. 397-398; see also *People v. Pierce* (1979) 24 Cal.3d 199, 208.)

Here, the bulk of the statements set forth in DeJong's juror affidavits are admissible under Evidence Code section 1150 in that they set forth statements made by the foreman and other jurors during deliberations and the voting procedure adopted by the jury foreman following the trial court's responses to the jury's questions.  However, some portions of the affidavits are objectionable in that they purport to set forth the

11

reasoning employed by two jurors who initially were unwilling to award substantial damages and later voted to award Buckley $2.8 million.  We have not relied on those objectionable statements in determining whether the jury reached an improper compromise verdict.

C. *Compromise Verdicts*

1. *Legal Principles*

Where the record shows a verdict was probably the result of prejudice, sympathy or compromise, or that for some other reason the liability issue was not actually determined by the jury, the verdict must be set aside in its entirety.  (8 Witkin, Cal. Procedure (4th ed. 1997) Attack on Judgment in Trial Court, § 106 et seq., pp. 700-701.) The question of whether a verdict was the result of improper compromise usually arises in cases where the damages awarded are inadequate as a matter of law, and the trial court must determine whether a new trial on the issue of liability, as well as damages, must be ordered.  In such instances, where in addition to the inadequacy of damages other circumstances show the probability of a compromise verdict, a new trial on both liability and damages is required.  (See *Lauren H. v. Kannappan* (2002) 96 Cal.App.4th 834, 841; *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1346; *Wilson v. R.D. Werner Co.* (1980) 108 Cal.App.3d 878, 883.)

Indicators of a compromise verdict are: (1) a close verdict; (2) jury requests for readback and jury questions; (3) jury indecision whether the plaintiff should recover a certain amount or nothing; (4) a subsequent jury election to straddle and award a

12

compromise recovery in a lesser amount than that to which the plaintiff would be entitled if the plaintiff prevailed; and (5) lengthy deliberations. (*Leipert v. Honold* (1952) 39 Cal.2d 462, 468-470; *Lauren H. v. Kannappan*, *supra*, 96 Cal.App.4th at p. 841.)

2. *Legal Analysis*

Although the circumstances here do not fit entirely within the rubric of cases where a compromise verdict has been found, in that the $2.8 million verdict the jury returned here is not so small and out of proportion to the evidence of damages as to be inadequate as a matter of law, in other material respects, the record establishes a convincing case the verdict represents an improper compromise by jurors who, although they did not believe Buckley was entitled to any recovery, felt compelled to reach a verdict that would have the support of nine members of the jury.

With respect to the amount of damages awarded, it is significant that, as DeJong points out, although the amount is substantial, there is no evidentiary or theoretical support for a $2.8 million award. In this regard, we note that during her rebuttal argument to the jury, Buckley's counsel told the jury there was no evidence to support any claim for any amount other than Buckley's demand for $5 million: "So what money? The only number we have heard is $5 million. That's the only number." In discussing a response to one of the jury's question, Buckley's counsel again reiterated the limited nature of the damages evidence Buckley presented: "That's what I said in my rebuttal: There was no evidence to support any claim for any amount other than the 5 million." In arguing against providing the jury with any response which permitted a lesser amount of

13

damages, Buckley's counsel emphasized that Buckley had dismissed his quantum meruit claim precisely to avoid a smaller verdict.

The only theory which arguably supports a $2.8 million verdict is one which was never presented to the jury: the proposition DeJong did not promise to pay Buckley $5 million but instead promised to pay Buckley an amount sufficient to start a trash-to-compost facility. Although there is considerable evidence Buckley planned to use the money he believed he would be receiving from DeJong to start a trash-to-compost facility, Buckley never testified that the amount due on his agreement with DeJong was tied to the amount needed to go into the trash-to-compost business. Rather, Buckley consistently testified, and his counsel urged, that DeJong simply promised to pay Buckley $5 million.

Thus, although, as we have indicated, this is not a case where the damages are inadequate as a matter of law, the evidence presented by Buckley and the theory of liability he argued are at such odds with the result reached by the jury, a similar inference of improper compromise arises.

In addition to the inference of compromise which arises from the sharp disparity between the verdict on the one hand and the evidence and argument on the other, the manner in which the jury deliberated provides important additional and powerful indicia of a compromise verdict. The jury's questions to the trial court are unmistakable evidence that the jurors were sharply divided over whether Buckley should recover a certain amount or nothing. As we have noted, the record shows that after asking two

questions about whether they were bound to award $5 million or nothing and being advised that they could award a lesser amount, the jury nonetheless reported that, after still further deliberation, they had reached a seven to five impasse. Thus, the record shows that very shortly before the jury returned its verdict, it was clearly divided between those who wanted to award nothing and those who wanted to award substantial damages. (See *Lauren H. v. Kannappan*, *supra*, 96 Cal.App.4th at p. 841.)

The inference of compromise is reinforced by the fact the jury deliberated for nine hours over three days as well as by the closeness of the eventual nine to three verdict. (See *Leipert v. Honold*, *supra*, 39 Cal.2d at pp. 468-470.) The voting process used by the jury foreman also strongly suggests some of the assenting jurors compromised their views of liability. There is no dispute in the record that, as reported by the juror affidavits submitted by DeJong, the jury foreman attempted to achieve a verdict first by having the jurors vote on diminishing damages amounts and then, when that was unsuccessful, conducting votes on increasing amounts of damages. In a case where the evidence and theory advanced by the plaintiff permit a range of damages and there is no sharp difference among the jurors as to liability, such a voting process might suggest an honest attempt to achieve a principled consensus. Here, however, where there was no evidence or theory that suggested a range of damages, and there was clear evidence the jury was at an impasse between those who wanted to award nothing and those who wanted to award substantial damages, the voting method adopted by the jury foreman strongly suggests that the eventual verdict was the result of improper bargaining rather

15

than any conviction based on what jurors believed the evidence supported.

The sequence of events before and after the jury notified the trial court it was at an impasse is also of some import. After the jury reported that, notwithstanding several hours of deliberations and two earlier questions of the trial court, it was still at an impasse, rather than declaring a mistrial and releasing the jurors, the trial court responded by instructing the jury to continue deliberating. Shortly thereafter and, by virtue of voting on an increasing level of damages, a verdict was returned. This sequence of events gives rise to a clear inference the verdict was a compromise driven by a desire to complete deliberations, rather than by any conviction the amount awarded was proper.

In sum, based on our independent review of the record, we are convinced the jury's verdict was probably the result of improper bargaining or compromise, and the judgment entered on the verdict must be reversed.[1]

---

[1] Because the jury's compromise verdict requires that we reverse the judgment and remand the case for further proceedings, we do not reach the remaining issues DeJong raises on appeal. In particular, we do not consider DeJong's contention there was no meeting of the minds with respect to the 2005 agreement. We note that, contrary to DeJong's argument, there was evidence, in the form of testimony from Buckley, of the terms of an agreement and DeJong's express assent to those terms. At trial, Buckley testified that in 2006, DeJong agreed to his terms:
"Q: I believe you had told us that [DeJong] eventually did agree to your terms, right?
"A: Right."
According to Buckley, DeJong's assent came in a telephone conversation. Buckley described those terms in the following testimony:
"Q: If Mr. DeJong's way worked and he was successful and he convinced them, when was your money due?
"A: Not until it was presented to the city on the agenda, and it was a resolution passed stating they would open the city's competition.
"Q: And if his way did not work, when was your money due?
"A: As soon as we found out, as soon as it was known that his way would not

16

II

For the guidance of the parties and the trial court on remand, we briefly discuss an issue which arose on appeal.

As we have discussed, according to Buckley, under his 1994-1997 agreements with DeJong, he was to receive a partnership interest in any successful trash collection franchise DeJong obtained in Poway, Encinitas or Escondido. Buckley described his agreement with respect to Poway as follows: "If we broke up the City of Poway and Arie was to get the bid, we would become equal partners and he would put up the money for the franchise." This description of the nature of his agreement with DeJong gave rise to questions we posed to the parties, to wit: 1) was Buckley's work with respect to Poway, Encinitas and Escondido contingent on DeJong being awarded trash contracts by those cities; and 2) would such a contingent agreement violate public policy. (See *Crocker v. United States* (1916) 240 U.S. 74, 79-80; Gov. Code, § 86205.)

There is little doubt that, as described by Buckley, his compensation under the 1994-1997 agreements was contingent on DeJong being awarded the respective municipal trash contracts. Moreover, a very substantial argument can be made that such

---

work."
 Buckley also testified at his deposition, which was introduced at trial and at trial itself, that the amount due was $5 million:
 "'[Q]: [Y]ou don't know at which of these locations it was that Mr. DeJong promised you $5 million, true?
 "'[A]: Correct.'"
 In short, Buckley testified that DeJong expressly agreed he would pay Buckley $5 million if: 1) the San Marcos City Council agreed to open bidding, or 2) it decided it would not open bidding.

an agreement was void as against public policy. The United States Supreme Court explained the law's unwillingness to enforce such agreements in *Providence Tool Co. v. Norris* (1864) 69 U.S. 45: "Agreements for compensation contingent upon success, suggest the use of sinister and corrupt means for the accomplishment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception. [¶] There is no real difference in principle between agreements to procure favors from legislative bodies, and agreements to procure favors in the shape of contracts from the heads of departments. The introduction of improper elements to control the action of both, is the direct and inevitable result of all such arrangements." (*Id*. at p. 55, fn. omitted.)

Significantly such agreements are void even if the parties act without any corrupt motive or intent: "[A]ll [such] agreements for pecuniary considerations to control the business operations of the Government . . . or the ordinary course of legislation, are void as against public policy, *without reference to the question, whether improper means are contemplated or used in their execution.*" (*Providence Tool Co. v. Norris*, *supra*, 69 U.S. at p. 56.)

At this juncture, we do not believe it is appropriate to resolve the question of whether the 1994-1997 contracts were void as against public policy. This defense was not litigated in the trial court and, hence, Buckley did not have the opportunity to fully contest its application to the 1994-1997 agreements and his claims against DeJong based on the parties' later 2005 agreement. In this regard, the record here does not permit us to

18

definitively determine whether any public policy defect in the earlier agreements, if it exists, also effects the later agreement.

Thus, on remand, DeJong may, along with other defenses, attack Buckley's claims on public policy grounds, and Buckley may fully contest application of that defense.

## DISPOSITION

The judgment is reversed and remanded.  DeJong to recover his costs of appeal.

BENKE, Acting P. J.

WE CONCUR:

McINTYRE, J.

O'ROURKE, J.